SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

| | |
|---|---|
| CHARBER CONSULTANTS LLC, and LIGHTSTONE RE LLC,<br><br>*Plaintiffs*,<br><br>-against-<br><br>MASK MEDICAL LLC, GJS SOLUTIONS LLC, and GAURAVJIT SINGH,<br><br>*Defendants*. | Index No. _____/2020<br>Date Purchased: June 15, 2020<br><br>**SUMMONS**<br><br><u>Plaintiff designates Kings County as the place of trial</u><br><br><u>The basis of venue is CPLR</u> 503(a), based on Plaintiffs' residence |

**TO DEFENDANTS:**

Mask Medical LLC
532 Old Marlton Pike
Cherry Hill, NJ 08053

GJS Solutions LLC
1700 Market St. Suite 1005
Philadelphia, PA 19103

Guaravjit Singh
805 S. Miami Ave., Apt. 1405
Miami, Florida 33130

   **YOU ARE HEREBY SUMMONED** and required to serve upon Plaintiffs' attorney an answer to the Complaint in this action within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty (30) days after the service is complete if this summons is not personally delivered to you within the State of New York). In case of your failure to answer, judgment will be taken against you by default for the relief demanded in the Complaint.

Dated: New York, New York
       June 15, 2020

                              **SCHLAM STONE & DOLAN LLP**

                       By: _____/s_____
                            Solomon N. Klein
                            Vera M. Kachnowski
                            26 Broadway
                            New York, New York 10004
                            Telephone: (212) 344-5400
                            Email: sklein@schlamstone.com
                            *Attorneys for Plaintiffs*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

| | |
|---|---|
| CHARBER CONSULTANTS LLC, and LIGHTSTONE RE LLC,<br><br>*Plaintiffs*,<br><br>-against-<br><br>MASK MEDICAL LLC, GJS SOLUTIONS LLC, and GAURAVJIT SINGH,<br><br>*Defendants.* | Index No. _____/2020<br><br>**COMPLAINT** |

Plaintiffs Charber Consultants LLC and Lightstone RE LLC, through their attorneys Schlam Stone & Dolan LLP, for their Complaint against Defendants Mask Medical LLC, GJS Solutions LLC, and Gauravjit Singh, allege as follows:

### NATURE OF THE ACTION

1. This action arises from Defendants' fraudulent sale of non-existent personal protective equipment ("PPE"), namely medical isolation gowns. Plaintiffs paid Defendants a deposit of $712,500 to purchase the gowns. Defendants never delivered and, as was later discovered, had **a)** presented to Plaintiffs a doctored brochure from a Chinese factory that did not even produce the gowns being ordered; **b)** sent Plaintiffs a fraudulent video showing manufacturing of gowns from a different factory and; **c)** lied about supposed contacts at the gown factory in China and its owner. Indeed, shortly after ordering the gowns, Plaintiffs discovered that Defendants also had sent them fraudulent FDA certificates for KN95 masks that they were trying to sell to Plaintiffs.

2. Plaintiffs brings this action for fraud, breach of contract, conversion and alter-ego liability to recover their losses from the fraudulent sale of gowns. In the midst of the global pandemic caused by the novel coronavirus, or COVID-19, the need for PPE has become of

1

paramount importance for those working in hospital settings and otherwise, and critical shortages have rendered PPE a hot commodity and a public health necessity. Disturbingly, unscrupulous individuals and businesses, such as Defendants, have sought to profit from the situation by engaging in fraudulent transactions and fake FDA certificates to sell non-existent PPE to unwitting buyers.

3. Plaintiffs were led to believe that they were entering into a legitimate contract to purchase PPE (medical isolation gowns) from Defendant Mask Medical LLC and its principal Defendant Gauravjit Singh. Defendants had identified a factory in China that supposedly manufactures the gowns and represented that they were in regular contact with the factory's owner, and sent a video of the gowns from the purported factory from which they were to be shipped. After Plaintiffs wired $712,500 to Defendants as a deposit for the purchase, however, the promised gowns were never delivered.

4. Defendants' representation that the specific type of gown Plaintiffs ordered was available from the factory in China was a lie – the video of the PPE was not from the claimed factory in China. The factory in China did not even manufacture the gowns ordered, and the individuals at the factory that Defendants purportedly were dealing with did not exist.

5. Defendants then absconded with Plaintiffs' deposit of $712,500. Plaintiffs bring this action to recover their damages in the amount spent for their deposit plus other costs.

### PARTIES, JURISDICTION, AND VENUE

6. Plaintiff Charber Consultants LLC ("Charber") is a New York limited liability company with its principal place of business in Brooklyn, New York.

7. Plaintiff Lightstone RE LLC ("Lightstone") is a New York limited liability company with its principal place of business in Brooklyn, New York.

2

8. Upon information and belief, Defendant Mask Medical LLC ("Mask Medical") is a New Jersey limited liability company, with its principal place of business in Cherry Hill, New Jersey.

9. Upon information and belief, Defendant GJS Solution LLC ("GJS") is a New York limited liability company with its address in Philadelphia, Pennsylvania.

10. Upon information and belief, Defendant Gauravjit Singh ("Singh") is an individual who resides at 805 S. Miami Ave., Apt. 1405, Miami, Florida 33130. Upon information and belief, Singh is the sole owner of Mask Medical and GJS and is the alter ego of the corporate defendants.

11. All of the Defendants have committed torts that have harmed Plaintiffs within the State of New York. Thus, all of the Defendants are subject to personal jurisdiction here under CPLR § 302.

12. Venue is proper in Kings County under CPLR § 503 because Plaintiffs Lightstone and Charber reside in Brooklyn, New York.

## BACKGROUND

13. This case concerns a fraudulent contract for sale of PPE, namely Level 1 medical gowns. In early May 2020, in the midst of the coronavirus crisis, the City of New York entered into a purchase order to secure over one million medical isolation gowns from a vendor, Woodhull Medical Supply ("Woodhull").

14. Woodhull was having trouble obtaining the gowns to fill the order. Mr. Brandon Kittendorf, a person working with Woodhull to fill the order, reached out to a principal of Plaintiff Lightstone, Barry Farkas, to see if Mr. Farkas could finance the purchase of the gowns to complete the order.

15. Mr. Kittendorf introduced Mr. Farkas to Defendant Singh, presenting him as the middleman with contacts at SUMEC Textile and Light Industry Co., Ltd. ("SUMEC") in Nanjing, China, the factory that was manufacturing polypropylene medical gowns. Kittendorf proposed that Mr. Farkas finance the purchase of gowns from a factory in China, and on Singh's behalf, he forwarded to Mr. Farkas a PDF showing product specifications of Level 1 gowns purportedly produced by SUMEC.

16. Mr. Farkas and a business colleague, Charles Berger, a principal of Plaintiff Charber Consultants, began communicating with Mr. Singh by phone and text message about potential deals for the purchase of 1.5 million gowns as well as for medical gloves. In order to persuade Mr. Farkas to complete the deal, on May 11, 2020, Singh sent Mr. Farkas "proof of life" photos and videos purporting to show SUMEC factory workers in China preparing gowns for the Woodhull order. Singh indicated that the factory was owned by his contact named "Anna."

17. On May 12, 2020, Mr. Farkas and Mr. Berger met with Singh in person in New Jersey. After the meeting, Mr. Farkas and Singh engaged in further back and forth negotiations via text message and Singh also advised that he "Spoke to Anna – gown factory – they will go ahead and get everything prepped for shipment. . . . Will be ready to ship out tomorrow. Gave them green light."

18. The understanding between Mr. Farkas and Singh to purchase gowns was then formalized in a Product Agreement between Lightstone and one of Singh's LLCs, Mask Medical. A copy of the Product Agreement is attached hereto as Exhibit 1. Under the Product Agreement, Mask Medical was to sell Lightstone 1.5 million medical grade gowns. The Product Agreement further contained a clause on Delivery terms, which specified that "Time is of the

essence in the performance of this Agreement. Seller will arrange for delivery by carrier chosen by Seller. Delivery shall be completed within 3 days or reasonable time." (*Id.* ¶ 5). In addition, the Product Agreement specifically provided that "The failure to make available or deliver the Goods in the time and manner provided for in this Agreement" constituted a material default under the contract. (*Id.* ¶ 8(b)).

19. The Product Agreement required an 10% initial deposit, and then additional installments: another 5% once the gowns cleared Chinese customs, an additional 15% upon delivery in Plainfield, New Jersey, and the final balance of 70% after Lightstone receives payment from Woodhull. Singh at first requested that the deposit be wired to his personal account, claimed that his business account was having trouble accepting wires, but eventually requested that the wire be sent to either Mask Medical or GJS's accounts.

20. On May 13, 2020, Singh sent over signed the Product Agreement and asked Mr. Farkas to send the countersigned contract back, noting "Just want to get this part done so I can confidently tell Anna to get her plane ready and scheduled with the pilot." As explained above, Anna was Singh's purported contact at SUMEC. By email dated May 14, 2020, Mr. Farkas sent his signed Product Agreement to Singh, and the deposit was fully paid to GJS via two wires on Friday, May 15, 2020 and Monday, May 18, 2020. Singh confirmed receipt of both wires.

21. On Saturday, May 16, 2020, Singh advised Mr. Farkas by text message that "Anna scheduled plane for another delivery for Monday- because I didn't confirm with her Friday morning as planned. Goods should be coming Wednesday, will have tracking/ docs Tuesday evening." No tracking information or documents were sent.

22. On Monday May 18, 2020, Singh confirmed to Mr. Farkas that the plane would be leaving the following night and that he would send sending pictures, videos and flight information when available.

23. The next day, May 19, 2020, Mr. Berger texted Singh asking for an update. Singh replied the next morning that he was "waiting on pics and shipping docs from Anna."

24. By Wednesday, May 20, 2020, Plaintiffs were concerned. Both Mr. Farkas and Mr. Berger again texted Singh for an update on the gowns, with Mr. Berger noting via text message that he was "starting to get antsy here. It's Wednesday and we've gotten zero info yet. It's midnight Thursday in China." Singh responded: "You and I are on the same page with that. I'm waiting on them to send the info. . . . I am waiting for an update today." He similarly told Mr. Farkas that he was just awaiting the document from "Anna," which he expected any time now. Throughout the day, Singh continued with various excuses claiming to be unavailable with various pretexts -- "on a plane", "phone having issues", etc.

25. Late evening on May 20, 2020, Singh claimed that he "Spoke to [Anna]. Should be rcving the pics and video of loading etc as discussed overnight. She did also ask if we wanted anything specific in the video (name) I said 'Charles/Barry/Raj' lmk if you want it to say something else. I made it clear to her you would be pulling order if speed isn't there. She got it, and assured me would get done overnight."

26. He made similar excuses in response to requests for updates the following day, Thursday, May 21, 2020 blaming problems with his phone and a miscommunication with Anna as to timing of the delivery, and assuring that the delivery would yet be forthcoming. Singh also offered to return the deposit.

27. Mr. Farkas again tried to contact Singh for an update on status on the shipment on Friday, May 22, 2020, but was unable to reach him. Singh again blamed plane travel for his inaccessibility. On Saturday, Singh stated that he should have the shipping documents that night or first thing the next morning. On Sunday, May 24, 2020, Mr. Farkas again sought details on where the gown shipment stood. Singh responded that the "gowns weren't ready till Friday because of the delays and miscommunication. Now the gowns are ready to ship and we are waiting on the shipping docs." Singh promised to send the shipping documents as soon as they were made available to him and to follow up with his contacts in China for more details on the flight. After contending that his repeated efforts to reach "Anna" were unsuccessful, Singh advised that he had spoken to Anna, that the plane was ready.

28. Mr. Farkas asked Singh to join the calls with "Anna", but Singh never did so.

29. At this point, Mr. Farkas told Singh that if Plaintiffs did not receive actuals details about the supposed shipping flight, they would cancel the contract. Singh then claimed that he had reached Anna's colleague, "Laura," and that they would have the plane loaded that evening and shipping documents available by noon the following day. He did not include Mr. Farkas in the call as promised, but Singh promised that he would dial him in the next time.

30. On Monday morning, May 25, 2020, Singh claimed that the flight with the gowns was delayed at the airport, but that it was scheduled to arrive at JFK at 1pm Wednesday, 48 hours from then. But despite requests, Singh never sent a flight plan, bill of lading, and other information to corroborate these claims.

31. After waiting all day without receiving corroboration that the gowns were indeed on a plane as claimed by Singh. Plaintiffs requested that the deposit be refunded, and Singh agreed to issue a refund.

32. Singh then claimed that he would only issue a refund if Plaintiffs released Defendants of any claims. On Tuesday, May 26, 2020, Singh told Mr. Berger that he was "on the phone with the lawyer getting the release docs for you I can wire refund. . . ." Throughout the day Singh continued to make promises about his lawyer sorting out the release paperwork. He also blamed a wire cut off time at HSBC for his inability to send the refund then, promising to send it in the morning. Having not received any release paperwork and in an effort to move things along, Plaintiffs sent Singh an email explicitly releasing all claims if their deposit were returned by the following day. Once again, despite Singh's promises, Defendants did not refund the deposit.

33. Instead, the next day, May 27, 2020, Singh claimed that he was able to obtain the gowns by swapping their order with that of another client. Singh claimed that "[t]hese are the same gowns that are supposed to be delivered and can be in your warehouse as early as tomorrow they are already here and cleared customs etc. attached you will find shipping documents to support that, as well as a POL [proof of life] video showing the lot with your name on it."

34. The gowns shown in the May 27 video, however, were visibly not the gowns specified in the PDF presented in the brochure to Plaintiffs and shown in the initial May 11 videos sent by Singh prior to entering into the contract. The gowns in the new video were visibly different from what was ordered: it was made from a different type of material CPE (chlorinated polyethylene) instead of polypropylene (which was sewn), with a different sleeve shape, and bore different labeling.

35. Further, the shipping documents revealed that the gowns had been sent by cargo ship, not by plane as Singh repeatedly claimed, and were not the products that Singh had claimed

were on "the plane." Moreover, using the information on the shipping documents, Plaintiffs contacted the shipping company and were able to speak with the person to whom the shipping containers actually belonged to – a doctor in Pennsylvania who was an actual customer of SUMEC. The doctor denied that he had agreed to allow the order to be re-directed to Plaintiffs and also confirmed that the gowns that Plaintiffs had ordered were not even manufactured by SUMEC.

36. The doctor further stated that the May 11 video purporting to show the SUMEC factory was not in fact a SUMEC facility. In addition, Mr. Berger and Mr. Farkas received from the doctor a PDF containing specifications for the gowns that were previously produced by SUMEC. This document was different from the brochure Mr. Farkas originally received, which was apparently altered by Defendants.

37. Indeed, Mr. Farkas and Mr. Berger later discovered that most of the information Singh provided had been untrue. Through a local contact, they reached out to the SUMEC factory and were advised by SUMEC that they had no knowledge of an "Anna" or "Laura", the individuals Singh repeatedly described as the owner and contact at the gown factory.

38. Plaintiffs also discovered that Singh had sent them fake FDA certificates with regard to a potential deal to purchase KN95 masks. Singh had offered to sell a large quantity of KN95 masks manufactured in Thailand that were purportedly certified by the FDA, and sent copies of the certifications. The number was for a valid FDA certificate. However, Plaintiffs later discovered that the certificate was issued by the FDA to a different (Chinese) manufacturer and was altered to appear as it was issued to the Thai manufacturer. Plaintiffs did not purchase the masks, but unfortunately had already signed the contract for the medical gowns by the time they realized that Defendants had sent them a forged FDA certificate.

9

## FIRST CAUSE OF ACTION
### (Breach of Contract)
### (Against All Defendants)

39. Plaintiffs repeat and reallege each and every allegation contained above as though set forth fully herein.

40. Lightstone and Mask Medical were parties to the Product Agreement, which was a valid, binding, and enforceable contract.

41. The Product Agreement expressly provided that time was of the essence and that failure to deliver the goods in the time and manner provided by the agreement constituted a material breach.

42. Lightstone fulfilled all of its material obligations under the Agreement.

43. Mask Medical materially breached the Agreement by failing to timely ship the gowns and send them for inspection at Lightstone's warehouse.

44. Further, Singh and GJS are alter egos of Mask Medical.

45. As a direct result of Mast Medical's breach, Lightstone has been damaged and continues to be damages in an amount to be determined at trial, but no less than $712,500.

## SECOND CAUSE OF ACTION
### (Fraud)
### (As to All Defendants)

46. Plaintiffs repeat and reallege every allegation contained above as though set forth fully herein.

47. Defendants misrepresented to Plaintiffs that they had access to hospital grade medical gowns and had connections to the owner of a factory that produced them.

48. Defendants sent a video describing the PPE that fraudulently misrepresented the product available.

49. Defendants, through Mr. Kittendorf, sent a PDF describing the PPE that fraudulently misrepresented the product available.

50. These misrepresentations were material and false at the time it was made.

51. At the time Defendants made the misrepresentations, he knew that they were false and that the Defendants would reasonably rely on the misrepresentations to their substantial detriment.

52. Defendants made these misrepresentations in order to fraudulently induce Lightstone to enter into the Product Agreement, and thereby secure payment of considerable funds from Plaintiffs.

53. Plaintiffs reasonably relied on these misrepresentations.

54. As a result, Plaintiffs have been damaged in an amount to be determined at trial, but no less than $712,500, plus punitive damages and pre- and post-judgment interest.

### THIRD CAUSE OF ACTION
**(Conversion)**
**(As to All Defendants)**

55. Plaintiffs repeat and reallege every allegation contained above as though set forth fully herein.

56. Defendants all exercised an unauthorized dominion over Plaintiffs' property by knowingly and intentionally demanding a deposit of $712,500 towards the purchase of a medical gowns, all the while knowing that no gowns existed and not producing any gowns in response.

57. Defendants misappropriated, took possession of, asserted ownership over, utilized and/or disposed of these funds with the intent of permanently depriving Plaintiffs of the same.

58. These actions interfered with and were in defiance of Plaintiffs' superior possessory right to these funds.

11

59. As a result, Plaintiffs suffered damages in an amount to be determined at trial, but no less than $712,500.

## FOURTH CAUSE OF ACTION
### (General Business Law § 349)
### (As to All Defendants)

60. Plaintiffs repeat and reallege the allegations in the preceding paragraphs as if fully set forth herein.

61. The Defendants engaged in deceptive business practices by misrepresenting to Plaintiffs the availability of medical grade gowns from a particular factory in China. These misrepresentations and omissions were material; indeed, they go to the very heart of the transaction Plaintiffs thought they were entering into.

62. The Defendants' conduct was consumer-oriented.

63. Plaintiffs were injured by the Defendants' conduct in an amount to be proven at trial.

64. Plaintiffs are therefore entitled to recover treble damages and attorneys' fees under Gen. Bus. Law § 349.

## PUNITIVE DAMAGES

65. Punitive damages are justified in this action given that Defendants' fraudulent conduct impacted the market for critical supplies during a pandemic. Defendants misconduct was deliberate, malicious and shocking to conscience, and there is a significant public benefit to prevent future such misconduct. Punitive damages should be imposed on Defendants.

**WHEREFORE**, Charber Consultants LLC, and Lightstone RE LLC demand a judgment in their favor on each of their claims, and such other and further relief as the Court deems just and proper.

Dated: New York, New York
June 15, 2020

**SCHLAM STONE & DOLAN LLP**

By: _____/s_____
Solomon N. Klein
Vera M. Kachnowski
26 Broadway
New York, New York 10004
Telephone: (212) 344-5400
Email: sklein@schlamstone.com
*Attorneys for Plaintiffs*

13